# Blakeslee *versus* Blakeslee.

1. In order to enforce a parol promise for the conveyance of land, *exclusive* possession by the claimant, in pursuance of the contract, is necessary.

2. A father promised to convey land to his son on condition of his marriage and residence with him. The marriage took place, and the son resided on the land in conjunction with his father. The father refused to convey a part of the land on account of not having a title from the Commonwealth, but promised to convey it when the patent was obtained; and the deed for the other part was executed and accepted: *Held,* that as to the part not included in the deed, the son had no better title than he would have had if no conveyance had been executed. The promise by the father that the son should afterwards have a title for the part omitted, being a parol promise, in itself gave no right to the land.

ERROR to the Common Pleas of *Crawford county.*

The plaintiff in error was the defendant below.

This was an action of ejectment by Reuben Perry Blakeslee *v.* Abraham F. Blakeslee, to recover the possession of 47 acres of land.

Both parties claimed under their father, Reuben Blakeslee, deceased. The father claimed the 47 acres in dispute by settlement, and he also owned otherwise twenty-two acres adjoining it; on the latter was his dwelling-house and other buildings.

The plaintiff claimed the 47 acres under a parol promise or agreement by his father. The defendant claimed under a convey-

[Blakeslee *v.* Blakeslee.]

ance from his mother, to whom the father, after making the parol promise, had devised it. His will was dated 11th March, 1848, and was proved on 14th October, 1848. He devised the land in question to his wife as above stated, and she, by deed acknowledged on 3d September, 1850, conveyed it to her son Abraham, the defendant. A patent for 288 acres and four perches of land embraced the land in dispute, and was dated 23d March, 1848.

In relation to the parol promise or agreement under which the plaintiff claimed, it was testified by Francis Webb, the scrivener who drew the deed for the 22 acres, as follows:

In March, 1843, Perry called on me to do some business between him and his father. I went to old Mr. Blakeslee's house. When I got there, old Mr. Blakeslee, Mrs. Blakeslee, and Perry related the arrangement made between them. They said they were about to give Perry a deed of their farm; had always intended doing so, but not so soon; that they had helped the other sons what they intended to, and the balance was intended for Perry. That Perry had been contemplating going to the west, and they did not wish him to go; and they had agreed if he would go and get married, and not go west, they would then give him a deed of their farm. They wanted him to marry Lydia Ann Lamonie, and if he would marry and bring her home they would give him the homestead place. Perry agreed he would bring the girl and marry her that evening; they were to live together, and one-half of the avails of the farm were to go to the father, and Perry to carry on the farm; they were to give Perry a deed, and he was to release to them a life estate. If Perry should clear more land, he was to have the product of that. The farming utensils were to be left on the place for Perry's use; the old man to own them. The marriage took place that night. I drew a deed that same afternoon; I made a deed of the piece of 22 acres; asked Reuben if he had any survey of the state lot; he said it had never been patented from the state, and on the whole I need not insert it in the deed; that I should wait until Perry came in. Perry came in, and the old man said he did not choose to give a deed until he should get one. Perry seemed displeased about it and requested it to be inserted, and the old man said it would make no difference, he might take and occupy it the same as though he had a deed; that arrangements were made or about to be made by which Abraham was to patent it, and he might get the deed from him.

The deed for the 22 acres was executed with that understanding. This was *before* the wedding. The deed was not delivered that day, but I left it for the purpose of making a life lease. A few days after, I made the life lease and delivered the deeds to both parties. The state lot adjoins the 22 acres on the north. Perry worked and put in crops on the state lot that season. I saw Perry chopping and logging afterwards; I don't know how much he chopped

and logged.    Reuben Blakeslee died in 1848; the old lady is dead; died two years last March.

Cross-examined.—(*Witness proved the deed drawn by him from Reuben Blakeslee and wife to Reuben P. Blakeslee, for 22 acres of land.*)    The life lease embraced no more than the deed; Perry said he would have the forty-five acres left out of *the lease.*    The old gentleman said he did not care, he would have *the buildings* and a home.    There was 25 acres of the state lot improved; there was five or six acres cleared afterwards; have seen Reuben and William Blakeslee working on the clearing; the use of the land would be worth $37½ or $50 per year.    I don't know how many years Perry occupied it; I do not know his age; a little while before the old man died he called me in, and wanted me to write a will for him; I wrote his will.

In chief.—He said he wanted a life lease to secure himself a home.

Sanford Bates testified to a conversation with the father, in which he spoke of the arrangement between him and Perry.    He said he had given the 22 acres and taken a lease for life; had not given a deed for the other, for he had none; but they were going to get one soon, and then he would give him a deed for that. That Perry was to work the place, and each one was to have half they raised as long as he and his wife lived; each one was to furnish half the seed, &c.    He said Perry was to take possession from that time, &c.    Perry lived in the house with his father for several years; after he worked on the state lot I cannot tell what improvement he made; Perry worked there and other hands worked with him; it was enclosed and heavily timbered.

It appeared that owing to some disagreement, Perry, some time in 1846, moved off the land to another farm a few miles off and remained a few weeks; when, at the solicitation of his father, he returned with his family and remained in the house until the death of his father and mother, and resided there at the institution of this suit.

Bates also testified that Perry did not work *the premises in dispute* after his father died; that his mother then took possession of it.    He further said: I do not know whether Perry occupied all the time or not.    I think likely I have seen other sons of Reuben Blakeslee working the land during the father's lifetime.

Peter Lamonie said: "I helped Perry clear about four acres and a quarter before Reuben Blakeslee died.    He quit it after his father died; he ploughed some; the old lady took possession of the land.    Her sons James and William worked the land; Abraham worked the state lot afterward.    After the old lady died Abraham forced himself into possession; said he would come in by force."

[Blakeslee *v.* Blakeslee.]

On part of the *defendant* it was testified that Abraham, the plaintiff, and his father, had an agreement that Abraham should take out the patent in his name, and convey to the father when he was paid his purchase-money and expenses; that there was difficulty about the land before the father died; that Abraham said he had nothing to do with *Perry*, but if his father or mother wanted a deed he was ready to make one on their complying with the contract. The witness said the contract was made between the father and Abraham *after* Perry's marriage.

*William* Blakeslee testified that *he* took the place the spring *before* his father died, and ploughed a part of the land in dispute. The next spring his mother hired another person. He further said that he worked on the place every year for eight years; sometimes his father and sometimes Perry hired him; that his father hired him to help him, and he hired me to help Perry clear on the 46 acres; they shared the product equally. He added, "The year that my father rented to me, Perry claimed a right to the place."

Cross-examined.—"Perry wanted to work the best part of the land my father rented to me. I would not agree to it, and Perry said if he could not work such as he wanted he would not work any; said he worked the place on shares."

On part of the *plaintiff* was proved a tender of $25 by the plaintiff to defendant in 1851, after the death of the mother, and a demand of a deed for the 46 acres.

Points were submitted on both sides.

GALBRAITH, J., charged, *inter alia,* as follows:—

The present falls within that class of cases in its principles, as alleged on part of the plaintiff, that when there is an omission, on the promise of the grantor, at the time of execution, it shall be the same as if inserted in the deed. It is a question of fact for the jury to determine whether there is satisfactory proof of the contract, possession taken, and the contract executed by the plaintiff, and this piece of the land left out, on the promise of the father that the trustee should make the deed as soon as he took it out of the land office. "Was there such a contract, and was the exclusive possession delivered to plaintiff in pursuance of that contract, and had defendant due notice of that arrangement, and did the plaintiff make valuable and permanent improvement on the land, in pursuance of the contract? If you are satisfied from the evidence of all this, the plaintiff is entitled to your verdict; if the evidence do not satisfy you of these or any material part of these, he is not."

"To the defendant's first point it is answered, that the evidence, if believed, establishes *a contract* and not a gift, and therefore the reasoning in the point is not adopted and is not correct.

[Blakeslee v. Blakeslee.]

" The second point is correct if the evidence establishes a gift and not a contract; if believed, it is a contract.

" To the third point it is answered, that if the testimony is believed, the plaintiff was not a mere cropper, and the reasoning adopted is not correct as applicable to it, and a seizure of it afterwards could not affect the rights of the plaintiff, acquired under an executed contract.

" To the fifth point it is answered, that if the testimony is believed, the marriage did not constitute the whole consideration; the farm was taken possession of, labor expended upon it, proceeds of crops to be delivered, &c., and therefore the conclusion would not follow as we are requested to say in the charge to the jury.

" To the sixth point it is answered, that in this, as in every other suit, the facts are for the jury; the law for the Court.

" The ninth and tenth points are founded upon what is probably a mistake of the scrivener, in drawing the lease to Reuben Blakeslee and wife, for the 22 acres; but still it does not affect the right of the plaintiff to recover, if the jury believe from the evidence, that possession was delivered in pursuance of the contract (if they are satisfied such has been proved), and improvements made, and notice to the defendant, so far as the land in controversy is concerned, and therefore the points are decided in the negative."

There were various assignments of error to the charge. The material ones were:—1. The Court erred in charging the jury, "That the present falls within the principle, as alleged by the plaintiff, that when there is an omission, on the promise of the grantor at the time of execution, it shall be the same as if inserted in the deed;" and in leaving to the jury to find exclusive possession in the plaintiff, contrary to the terms and stipulations of the alleged contract and all the evidence in the case.

Also, in the allegation that the ninth and tenth points were founded on what is a probable mistake of the scrivener in drawing the lease from Perry to Reuben Blakeslee; when there is neither proof nor allegation direct or inferential of any mistake.

*Finney*, with whom was *Farrelly*, for plaintiff in error.—It was said that the agreement in this case was merely *executory*; and secondly, that there was no *exclusive* possession in the plaintiff; that by the terms of the contract the father was to remain in possession, the deed having been given under the express condition that a life estate was to be immediately conveyed to the father and mother, and the survivor. The father remained on the land till his death, and in 1848 leased to his son William. That the possession must be *exclusive*, was cited Frye v. Shepler, 7 *Barr* 91.

[Blakeslee *v.* Blakeslee.]

It was said that the plaintiff had not made out a case on which a chancellor would decree a specific execution. There was no money consideration; no service rendered or to be rendered to the grantor, except what the grantee was to be compensated for by the rents and profits, and no permanent or valuable improvements were put upon it by the plaintiff; that the land was not appreciated by improvements. There was cited 3 *Pa. Rep.* 364; 6 *Watts* 509; 3 *Watts* 253.

Where a person, endeavoring to enforce a parol contract, fails to give evidence of such facts as are necessary to take the case out of the statute, it is the duty of the Court so to charge the jury: 2 *Barr* 315; 7 *Id.* 103; 5 *W. & Ser.* 548.

This is not the case of *a mistake* or fraudulent omission in a deed; the 46 acres was not inserted in the deed by the express direction of the grantor. Cited 1 *Rawle* 108; 3 *Barr* 251; 1 *W. & Ser.* 195.

*Derrickson,* with whom was *Richmond,* for defendant in error. —It was said that the contract was an entirety; and it was contended, that, under the circumstances, the part omitted on account of want of legal title should be considered as included in the deed: 1 *Ser. & R.* 464, Christ *v.* Diffenbaugh; 3 *Rawle* 345, Flagler *v.* Pleiss; 2 *Barr,* Tyson *v.* Passmore; 7 *Barr* 117, Renshaw *v.* Gans; 2 *Id.* 13; 4 *Id.* 166; 5 *Id.* 103; 14 *Ser. & R.* 144; 2 *J. & C. Rep.* 385, Gillespie *v.* Moore; 1 *Peters* 13.

It was said that the plaintiff's right to the land originated in contract and not by gift; that he performed what he contracted to perform; that the land in dispute was omitted at the urgency of the father, and that it was fraudulent to attempt to take advantage of this. It was said that the plaintiff held exclusive possession of the 46 acres, until about the time of the father's death, when difficulties arose and a mixed possession was the result. It was further said that the question of exclusive possession was left by the Court to the jury; and that the marriage of itself was a sufficient consideration for the grant: 1 *Baldwin* 395 was referred to.

The opinion of the Court was delivered by

BLACK, C. J.—These two parties are brothers. Their father was the owner of sixty-eight acres of land in a body. For twenty-two acres including the buildings, he had a perfect title, and for the other forty-six a settlement right. In 1843, he proposed to his son Perry, the plaintiff, that if he would marry and remain at home, and work the land, giving him and his wife during their joint lives one-half the produce and the use of the mansion, he would give him a deed for it in fee, to take effect after the death of the surviving parent. The son agreed, and a scrivener was sent for, who drew a deed in the usual form, without reservation, and

[Blakeslee v. Blakeslee.]

also a re-conveyance from the son to the father for a life estate. The father objected to inserting the forty-six acres, because he had no paper title, but promised that Perry should have a conveyance in another way at another time. This was consented to, with some reluctance, and both instruments were executed for the twenty-two acres. Perry married, and remained at home, and kept the kind of possession agreed on until his father's death. The father devised the land to the mother, and she conveyed it to another son, Abraham, the defendant below, who occupies it now.

This statement of facts may, in some respects, be slightly inaccurate, but it is as nearly correct as the bad condition of the paper-book on both sides will enable me to make it.

The plaintiff is seeking to recover the forty-six acres without having the slightest written evidence of his title, and therefore in direct opposition to the statute of frauds. Is there anything in the circumstances of the case to take it out of that statute? Has he proved the payment of purchase-money and exclusive possession taken, in pursuance of the parol agreement? It is not necessary to say whether the evidence proves a contract or a gift. Neither are we called on to say whether the marriage of the plaintiff is such a consideration for the land as would be equal to a payment in money. The judgment cannot be sustained, for a reason that makes all others of no importance. There was no exclusive possession in the vendee. The twenty-two acres included in the written conveyance, and the forty-six now in dispute, were used and occupied as one farm. The vendee farmed the land and lived in the house, but his father lived in the same house, owned the farming implements, and received the half of the crops. The share which the son got was not more, probably, than the value of his labor. It may be said that the father regularly received all the profits of the land, and had his home upon it. Can it then be said that the plaintiff's possession was exclusive? The ancient departures from the statute of frauds have been much lamented in modern times. The rule, therefore, which requires the vendee in a parol contract to show everything which equity requires to entitle him to relief from its operation; instead of being relaxed, is becoming tightened by degrees. It has now got to be a work of some difficulty to establish a contract in a way which will stand the test to which it is sure to be subjected. But if a sale not witnessed by a writing is hard to support, what ought to be the fate of a demand like the present, which is directly in the face of a deed? It cannot be said there was no writing here. There was but one bargain between the parties, and that was attested and consummated by an interchange of their solemn deeds. When the plaintiff claims land not embraced in the deed, he is encountered not only by the statute of frauds, but also

[Blakeslee v. Blakeslee.]

by that other rule of law, equally unbending, which makes the deed conclusive evidence of the contract.

It is argued in this case, that the deed does not express the con-tract, and that a chancellor would reform it or ·decree on the evidence as if the forty-six acres were included. This is an error. Parol evidence can only be ·admitted to vary or change the terms of a written paper in cases of fraud or plain mistake of fact. All the cases cited by the defendant in error go to establish this principle, and they establish nothing more. In Christ v. Diffenbauch, 1 *Ser. & R.* 464, ·a party who had been tricked into signing a lease without a covenant in his favor, which had been agreed to, was permitted to prove the truth. Hamilton v. Asslin, 14 *Ser. & R.* 448, was a case of plain mistake by the scrivener, who inserted what neither party assented to. In Flagler v. Pleiss, 3 *Rawle* 345, a lot was sold and the purchaser took possession. The vendor falsely and fraudulently described it in the deed as containing less than it did, and made an effort to hold the balance to himself. The grantee recovered what she bought, but the Court said, without fraud and deception the deed would have been conclusive. Tyson v. Passmore, 2 *Barr* 122, decided that a mistake in law produced by the false representation of a party who afterwards seeks to have the advantage of it, may be relieved against. Clark v. Partridge, 2 *Barr* 14, was declared by the Court to be a case of palpable ·fraud. Zentmyer v. Mittower, 5 *Barr* 403, is very strong authority for the doctrine opposite to that on which this case was decided in the Common Pleas. It decided that parol evidence, unless it amounted to clear proof of a fraudulent representation by one who has an interest in the transaction, is not admissible to vary a deed.

Was there any fraud or falsehood practised on the defendant in error by his father? Most assuredly the evidence submitted to us does not prove any such thing. Nor is there a fact asserted in the argument from which we could fairly infer that there was the slightest deception. Both parties acted with their eyes open equally wide. Undoubtedly the original contract was that both pieces of land should be conveyed. When the papers were preparing, the father proposed that one piece should be left out of the deed, and he carried his point by saying, what the son knew, as well as he did, to be true, that he had not yet perfected his title from the Commonwealth. Neither was there any mistake made by the scrivener. He wrote just what he was directed. No deed or other writing was ever reformed upon such evidence. The promise of the father that the son should have a title afterwards, for the forty-six acres, adds nothing to the force of the previous contract. It was a parol promise, and in itself gave no right to the land.

This then is a plain case. Simply stated, it stands thus: A

[Blakeslee *v.* Blakeslee.]

father agrees, by parol, to give his son sixty-eight acres of land. He afterwards makes and delivers a deed for twenty acres, a portion only of the sixty-eight. The deed being made without fraud and accepted without mistake, cannot be treated as a conveyance of land which it does not mention. The promise to convey the remaining forty-six acres, whether made at the date of the deed or before, still rests in parol and cannot be enforced, because the statute of frauds forbids it, and because there was no such exclusive possession under it as will enable a Court to decree performance.

We do not say, that there was an absolute merger of the contract in the deed. But, at least, it was no more than a part execution of the previous bargain. The deed for a portion of the land does not take the contract for the balance out of the statute. The vendee has no better title for the forty-six acres than he would have had for it if no conveyance had been made of the twenty-two acres. Since his deed does not cover the land in dispute, he can only fall back on the verbal agreement, and that, as I have already shown, will not support him.

Judgment reversed and <em>ven. fa. de novo</em> ordered.